20-3489 North Dakota, North Dakota XRail at all versus United States at all, and 20-3492 North Dakota, Billings County, North Dakota at all versus United States at all. All right, I have here two lawyers arguing for the appellants, but I don't have a breakdown of time. Madam Clerk, do you know how that's divided? Yes, your honor. Mr. Sagsveen will take nine minutes with no rebuttal. Ms. Brooks will use six minutes reserving two for rebuttal. Very well. Mr. Sagsveen, we'll hear from you first. Good morning, your honors. May it please the court. My name is Matthew Sagsveen and I represent the state of North Dakota in this action, quiet title to sexual mine rights of way in certain segments of the national grasslands in North Dakota. In this case, the district court determined that forest service communications related to the national grasslands constituted notice to the state of an adverse claim under the quiet title act. The state's position is that the district court erred by concluding the communications put the state on notice of an adverse claim. I'm going to start today by first briefly addressing the state's claim and interest in the management plans and public notices, which are collectively referred to as forest service communications, do not constitute notice to the state that its claim was time barred based upon the quiet title act statute limitations. The district court determined the following forest service communications constituted notice to the state of an adverse claim. The 1976 Cheyenne travel plan, the 1977 Little Missouri travel plan, and certain public notices issued for the Cheyenne grasslands. There are at least three reasons why the forest service communications do not constitute notice to the state under the quiet title act. First, the plain language of the forest service communications recognizes and carves out private and public property in state and county road systems. Second, laws applicable to the national grasslands and forest service management of the grasslands expressly preserve valid existing rights and express limits on forest service management of the national grasslands. Third, if time allows, the forest service communications did not constitute a claim of exclusive control, your honors, over the state's section line rights of way. First, the state's property interest at issue in the national grasslands is its section line rights of way. Section lines are established as a matter of law in North Dakota. The section line right of way is considered a public road open for public travel regardless of whether or not a road has been constructed on it. The right of way was perfected in 1871 by the Dakota Territorial Legislature and codified into law in 1889. The North Dakota Supreme Court has recognized the rights of way in numerous opinions as has this court in Bird Bear versus McLean County. Now first, although section line rights are established as a matter of law, the district court concluded the forest service communications did not recognize the rights of way constituted notice to the state for purposes of the Quiet Title Act. State's position is that the district court erred because the forest service communications on their face are not sufficiently specific as to be reasonably calculated to put the state on claim to the rights of way. The forest service communications do not address all property rights or include specific language that limit their application. None of the forest service communications expressly refer to section line rights of way and that's really the most important factor to consider here. The section line rights of way overlays nearly the entire state of North Dakota regardless of whether a road has been constructed. All the forest service communications were limited to certain portions of the respective grassland segments and specifically, your honors, the 1976 Cheyenne Travel Management Plan provides that it would recognize state law. The situation statement for the 1977 Little Missouri Travel Plan provided state legislation must be considered and all legal rights of private landowners must be The travel plan will not apply to the intermingled lands of other ownership, primarily private and state ownership, and that the controls do not apply to state or county road systems. Two of the public notices for the Cheyenne also included the statements that controls did not apply to the state and county road systems and the communications were limited in their application both by time, area, and season. The forest service communications, your honor, on their face do not provide notice to the state. The district court's focus on the definitions of existing road and its determination that federal law is not subject to state law disregards the contents of the forest service communications in their respect for private and public property, state law, and state and Similarly, counsel, counsel, why wouldn't this very specific definition of an existing road provide notice, especially when the county and state road system that you're describing, as I understand it, is not all actual roads? The state's position, both at the district court and here, your honor, is that as a matter of law, the state's, the state's property interests and of a section line road. So the fact that a regulation might reflect a requirement on the surface does not result in the extinguishment or what I would say is the merger of the servant, servient, and dominant estate. Simply put, in this, in this court has frequently relied upon state law to interpret the Quiet Title Act is that management of the surface does not affect the underlying right-of-way. So I hope I answered your question, Judge Kelly, but North Dakota is not claiming that federal law is per se subordinate to state law, rather, that the management activities in the forest service communications intentionally carve out and respect public and private property and state and county roads, including section lines. Now the Forest Service also raises additional Forest Service communications, but these were rejected by the district court. The 1970s, 1974 Badlands Plan did not prohibit anything. It was management prescription. In that document, the Forest Service recognized it had no authority on private land and called for a spirit of cooperation. It also recognized that existing land commitments would be honored. The second plan called out by the Forest Service is in its, or in the United States, in its briefing, is the 1975 Rolling Prairie Plan. The same principles and the 1974 plan are found in the 1975 plan. The third is RARE 2. The United States raises the RARE 2 program, but this plan and program failed like RARE 1. RARE 2 was enjoined and abandoned by the Forest Service. No final decision was made, and the district court determined that this was not noticed to the state. I'm going to move on, Your Honor, to the second reason, important reason, Forest Service communications should not be considered as noticed to the state under the Quiet Title Act is because federal laws and regulations expressly mandate that the Forest Service recognize valid existing rights. Now this, the issue of valid existing rights has been, the United States has criticized the state for raising this issue as a merits issue, but it is a merits issue, but it also relates to how the state construes Forest Service actions and it relates to the reasonableness of the state's actions. And what I'd start out by saying is, Your Honor, there's a legal presumption that the Forest Service and its officials will follow the law applicable to the Forest Service. It was reasonable for the state to believe that the Forest Service would preserve valid existing rights because the law mandated such recognition when the United States acquired lands in North Dakota for the National Grasslands. It was also reasonable for the state to believe the Forest Service would preserve valid existing rights when it manages the National Grasslands when federal laws mandate. But I understand your point about sort of the notice, but wouldn't that still require the district court to get into the merits of that claim of a valid existing right? I don't think so, Judge Kelly. I think the valid existing rights can be understood in the context of a reasonableness standard that this court hasn't frequently applied to interpret the Quiet Title Act. You don't just look at it from the perspective of the Forest Service, but you look at it from the perspective of the state of North Dakota where its actions reasonable when federal law specifically carves out and preserves valid existing rights and the laws and regulations applicable to the Forest Service do. I think it's reasonable to conclude that the state thought or presumed that the Forest Service would follow federal law and regulations. And I see that my time is up. Are you saying that it would be unnecessary to decide the merits of whether the state has a valid existing right because you say the state reasonably could have believed that the notice didn't extend to something over which the state has at least a reasonable claim of right? Is that your point? Yes, Your Honor. I see. All right. Thank you for your argument. Ms. Brooks, we'll hear from you. You'll need to turn on your microphone. I was pushing the wrong button. I'm sorry. Constance Brooks here today on behalf of the Western North Dakota counties. Okay, now you've turned off your camera, so if you turn that on then we'll have both. Okay, am I back? No, I turned it off again. Okay, camera's back, voice is back. Good morning, Your Honor. We just have a black screen now. How did I do that? I have no idea how that happened. I'm showing off, on, it was working. This is embarrassing. Everything was working perfectly. There we go. Here I am. Good morning. All right, now we have a picture. Now you're in the screen and we can hear you, so you may proceed. I apologize. There's nothing quite like a baby boomer trying to learn technology. Anyway, Constance Brooks here on behalf of the Western North Dakota counties of Billings, Golden Valley, McKenzie, and Slope. I'm framing my argument somewhat differently than Mr. Saxbeam, but I want to be clear that the counties agree with the state and we have worked closely together. I think one of the first questions that we encounter, and I think Judge, the District Court, correctly applied the decisions of Michael versus United States, McFarland versus United States in the 10th Circuit cases, because there is no 8th Circuit case law that expressly addresses when does a management action of a federal agency affect an adverse claim of a right-of-way sufficient to trigger the statute of limitations under the Quiet Title Act. The 9th Circuit and the 10th Circuit have reached the conclusion that because the right-of-way can peaceably coexist with the federal management estate, it's only when that exercise of the right-of-way is closed, shut down, denied. This is very comparable to the 8th Circuit's decision in Patterson versus Buffalo National Park, where the court held it was not the deed that triggered the statute of limitations, but rather it was the denial of the right-of-way application. By analogy, it's the denial of the section line right-of-way and its use. In this case, the United States has argued that there were a host of federal land management actions, which are in the ordinary course of business in managing the national grasslands, that somehow came to trigger the statute of limitations. The reason we have focused so much on the right-of-way or on the valid existing rights is because for the most part, with the exception of about 100,000 acres, the land in North Dakota was acquired by the United States. Under Forest Service regulation, under case law, if the United States did not acquire the right-of-way at the time of reacquisition or later, then these are outstanding and reserved rights, and the United States enjoys less authority to regulate. They can regulate the exercise of the right-of-way to protect their resources, but they don't control the actual right-of-way. This is not an RS-2477 case that has been argued by the United States, because RS-2477 applies only to public domain, and the rights-of-way that we're talking about in the time period were acquired rights. The cases of Michael and McFarland are also important because the United States exercised closures to protect the hunting public on a seasonal basis, and the travel plans also closed roadless areas during the roadless study. We know from the King County decision that a roadless study itself or a roadless designation did not trigger the statute of limitations, but more important, under McFarland and Michael, it's temporary closures that don't effect an adverse claim sufficient to trigger the statute of limitations. If you look at it from a slightly different perspective, had the county or the state filed suit in 1980 after the expiration of the travel plan, there would have been no jurisdiction under the Quiet Title Act. At that point, it's clear that a temporary closure does not effect an adverse claim as construed under the Quiet Title Act, because it is a temporary closure. Sarah, I have a question for you on a slightly different point. What is your view about the fact that the controls do not apply to state and county road systems? We share the state's view, and I think, let me expand. From the perspective of the county and the county residents that were using these lands, exclusion of the state and county road systems, and the fact that you just go, okay, fine, we're not affected by this. Certainly, that has been the United States' argument in other litigation, when they say, the county doesn't have standing to challenge, because we excluded the state and county road systems, or they say we excluded valid existing rights. Your view is that the section lines are that? Yes, Your Honor. Section lines under North Dakota Century Code are defined as a public road. Because there is no federal definition of a road, under Southern Utah Wilderness Alliance versus Bureau of Land Management in the 10th Circuit, the court explained the reasons that the federal government will borrow from the state law to define a road. Okay. Yes. My other point, I have 20 seconds, so I will rush, is the government has argued that if section claim for one claim was sufficient to trigger the statute of limitations throughout the state, but it's not a single theory, because it was a multitude of different management actions, doesn't fall within Spirit Lake or North Dakota versus Block. Thank you for your attention, and I will finish up in my next two minutes. I know your time has expired, but on that last point you made, what's your proposed distinction from Spirit Lake when you say it's not a single action? Okay, this court, the 8th Circuit has held that if the proponent of the right of way, interest in land has a single legal theory, then it doesn't matter if it was only one section that was litigated, it would be affected. In North Dakota versus Block, it was one mineral lease within the Little Missouri River. In Spirit Lake, it was a transfer of land that the tribe believed it owned, and that was the legal theory, so therefore the court said that was noticed as to all of the affected land. Our point is, is that we're talking about different management actions that allegedly affected the adverse claim, so it's not a single legal theory, we have to look at each event as it occurred based on the management action asserted by the United States. You mean each of these Forest Service actions in the 70s and 80s, is that what you're saying? Yes, exactly. All right, thank you for the answer, thank you for your argument. Mr. Halinan, we'll hear from you. Good morning, your honors, my name is Daniel Halinan for the United States and this matter. In this case, North Dakota and the counties are seeking to upend decades of management of the national grasslands in North Dakota, but these claims were brought decades too late. The section line claims brought by the state and the counties are sweeping in their scope and would be unprecedented in their consequences for these grasslands. The state and the counties are claiming a right to unilaterally construct roads without the permission of the Forest Service across more than 4,000 miles of section lines in the national grasslands. And in, for example, the roadless areas discussed in the travel plans at issue in this case, we're talking about undeveloped lands. And the state and the counties are seeking a right to build new roads in a grid-like pattern, which could be, you know, essentially every mile, the way the section lines are drawn, based pretty much entirely on lines that were drawn on a map, you know, not maintaining continuing existing roads or trails or anything like that. This claim is fundamentally inconsistent with Forest Service's management of these lands since they became part of the national forest system in the 1960s. And for that reason, the district court correctly concluded that these claims were barred by the statute of limitations. The Quiet Title Act, of course, has a 12-year statute of limitations, one that the courts have repeatedly described as already very generous. So a suit filed in 2012 like this one is timely only if the claims accrued at some point in the 21st century. And here they did not. As the district court correctly held, the claims at issue here accrued no later than the 1970s or the 1980s, when the Forest Service's imposition of restrictions on the land was plainly adverse to plaintiffs' asserted right to maintain rights of way across the grasslands. And from that point, they were on notice of a federal claim. Regardless of the reasons, plaintiffs did not file suit until 2012. So that means that the claims are barred by the Quiet Title Act, and we'd ask the court on that basis to affirm the judgment below. Today, I'd like to briefly cover three points in addition to answering any questions that the court has. The first is this question alluded to earlier about the relationship between the merits of the case and the statute of limitations issue. The second is the sufficiency of the notice provided by the Forest Service through its management actions in the 70s and 80s. And finally, just this point addressed at the end about whether or not that's sufficient under Spirit Lake Tribe and Block 2 to constitute notice for the entirety of the plaintiff's claims. So first of all, the issue on appeal today is, of course, a question about the limitations period, the application of the statute of limitations, and not the underlying merits of the plaintiff's claim. Compliance with the statute of limitations is necessarily preliminary to any analysis of the merits questions because under the Quiet Title Act, of course, the statute of limitations implicates the federal government's waiver of sovereign immunity, and that makes it a jurisdictional matter. So at this point, the court need not wade into these merits issues in order to address the statute of limitations issues as the merits of these claims don't actually bear on whether the claims were timely. As, of course, this court has also explained, even invalid claims are sufficient to trigger the statute of limitations. But I also want to be clear that this is not a case where the ultimate resolution in favor of the United States depends on resolving the case on a threshold issue because plaintiff's claims here are meritless. A legislative declaration like that in the North Dakota Century Code is insufficient to establish a right of way over federal land to accept the RS-2477 grant, etc. As Ms. Brooks said, they have an alternative theory that the reacquisition of some of these lands, not all of them, but some of them in the 1930s, was subject to existing rights. Again, that is a merits issue that doesn't bear on whether or not the statute of limitations has expired. So second, I wanted to highlight that we're talking primarily about a fairly legalistic interpretation of the notice requirements because looking at the record that we've developed, in the 1970s and 1980s, everyone understood what was going on here in terms of the federal government's adverse view of rights of way over the section lines. You can see that in several places in the record, as we've pointed out in our brief. For example, after adoption of the 1974 management plan for the Badlands, there was this litigation with Slope County where ranchers brought it to their attention that the management plan would foreclose use of these alleged rights of way on the federal land, and that's led to interactions with the North Dakota state government where there was discussion and a memo to the governor about whether something like a friendly suit was necessary between the federal government and the state to sort out these issues. Similarly, after the adoption... Can we focus, if you could, on the specific documents or communications that are said to provide the notice? I know you have a whole raft of them, and Judge Hublin rejected several of your suggestions. So if we could zero in on the ones that were cited, I think that could be helpful, at least to me. Of course, your honor. So the two travel plans from 1976 and 1977, followed by the 1980 closure orders were the specific documents relied on by the district court to conclude that there was sufficient notice here, and we think the district court got that right. You know, actual knowledge and things like that is not necessary to show sufficient notice under the Quiet Title Act. All that we need to demonstrate is that there are public communications that were reasonably calculated, put the state on notice, and that would be sufficient to meet the standard for the counties as well. The 1976 Cheyenne travel plan, of course, limited travel within the robust areas at issue in that plan to existing roads. There was signage put up, and the notice provided by the government also explained that there were potential civil or criminal consequences for violating the order. That is sufficient to demonstrate that the United States has an exclusive right or a right to exclude within those territories, which would otherwise be crossed by section lines, and is fundamentally inconsistent with the assertion of a right of way to construct a road or anything like that. The same is true for 1977. Did the 76 plan define the term existing roads? The existing roads definition did not, but that the 77 Missouri plan did. The existing roads definition that we rely on, yes, your honor, is in the 1977 Little Missouri plan, subsequently repeated in the 1980s orders that also applied to Cheyenne National Grasslands. That definition, of course, defines roads to be limited to things like roads that are subject to four-wheel travel within a recurring over a one-year period that involves soil displacement and compaction, no vegetation, things like that, which is inconsistent with an undeveloped alleged right of way over these areas within the National Grasslands. So by the way, sir, what do you say, though, to the fact that the same document stated that the controls do not apply to county state or county system roads? Why wouldn't that encompass undeveloped roads that are defined in North Dakota as roads when it's juxtaposed with a separate statement about existing roads? Yes, your honor. So first of all, for the reasons sort of laid out in our briefing, under the state's own conception of state and county roads, these couldn't possibly all be roads because there are numerical limitations that were in place at the time. And the 4,000 miles of section lines throughout the grasslands would cause the total number of roads that they're claiming to exceed what state and county law would otherwise provide for. This is at page 45, I believe. What do you mean by numerical limitations on roads? I thought the statute defined all the section lines as roads. Are you talking about a limitation on paved roads or something, or what's the limitation? So I'm talking about two different, we're talking about two different statutes here. One is the Century Code provision incorporating the 1871 Territorial Law about rights of way over section lines. The other are these provisions in the Century Code defining what the state and county road system means. So in those laws, there is, for example, a definition that there can't be more than 1,000 miles of designated county road systems, things like that. So there are numerical limitations that are fundamentally inconsistent with the conception that every section line in the state of North Dakota is automatically part of the state and county road system. But in addition to that, if you look at how the federal government is thinking about these things, we did, of course, provide our own definition of existing road, which is inconsistent with the conception of an undeveloped right of way as a road. And the government was talking about these as roadless areas and managing them in that capacity, imposing limits on off-road vehicles, things like that, which would, again, be inconsistent with understanding that these section lines are, by and of themselves, state and county roads that are excluded from the limitations within the travel plan. I'd also like to note that unlike some of the cases that have been discussed in the briefing concerning limited management of existing roads, we are, again, talking about areas that are undeveloped and that the closures that we're talking about are enforced by signage and possibility of civil and criminal penalties. So the federal government is clearly communicating through those actions that it doesn't believe there's a right to use these alleged rights of way in the way that, for example, in the Ninth Circuit cases that have been discussed, there was actually an existing road there that was being used. So the contention was whether or not the federal government's permitting people to have an adverse claim. Here, there's no usage in that sense because the United States is asserting a general right to exclude that is clearly signed and backed by the threat of enforcement. I also wanted to address this question of Block 2 and Spirit Lake Tribe and how they apply to this case. There is nothing to distinguish the reasoning of those cases from the present case in that the claims here were alleged in bulk. There is one theory presented in the complaints and the reasoning of Block 2 and Spirit Lake Tribe provide that when you have that kind of claim where you're bringing a general claim, the sufficiency of notice that the government is rejecting that kind of claim is sufficient for all of the claims. The counties, I think, have sort of suggested that they have individualized claims as we heard earlier, but they alleged a claim as to all section lines. They're unnoticed for the reasons that we detailed from those 1970s and 80s travel restrictions that the United States doesn't recognize that claim. So much as different parts of the riverbed or lake in Spirit Lake Tribe or Block 2 were sufficient to constitute notice for the entirety of the riverbed or the lake, so too here where if the United States has demonstrated as it has through public communications that are reasonably calculated to provide notice that it has an adverse claim as to section lines, it doesn't matter if the federal government has gone through and identified every single mile of the more than 4,000 miles of national grasslands. Once notice is given, that's sufficient for the entirety of the claim. To summarize, the United States has long rejected the plaintiff's claims to rights of way over land adjoining section lines in the national grasslands. That should come as no surprise to anyone. For reasons we explained, there was a plentiful documentation of discussions within the state government acknowledging the adverse federal claim and discussing what to do about it, and plaintiffs for that reason should have brought their claims a long time ago. This court should affirm the district court and find that these claims are time-barred. Unless there are any further questions, I thank the court for its time. Counsel, I do have a question before you finish, and this may be just a detail, but the complaint, but let me put it this way. Within the grasslands, this forest land, forest service land that we're talking about, are there still some tracks or some sections that are owned by the state? Yes, your honor. Okay, the complaint talks about, I think it describes trust lands section 16 and 36 in most townships, so how does that fit in to the notice issue? The way that the section lines in this part of North Dakota have been divided up, there are adjacent portions belonging to the state and federal government. The federal government is talking about its assertion of exclusive right to exclude from section lines within federal property, so this doesn't get into questions of section lines that also cross state lines. But these travel plans and closure orders, they don't carve out or mention, or do they? Do they carve out or do they mention that they don't apply to state-owned lands? There are exceptions for private property or state and county-held property within the areas that are subject to the travel restrictions, so we're talking about exclusively the federal land, providing notice as to section lines on the federal land. Oh, I know you say that's what you're talking about, but what about the travel plans and closure orders themselves? Does the text exclude from its effect state-owned lands? I don't have a citation for you, your honor, but yes, there are. The management activities here do account for non-federal land. All right, thank you. Thank you, your honor. All right, thank you for your argument. Ms. Brooks, I think we were going to hear from you in rebuttal. We'll give you two minutes to respond. Thank you. Let me be clear that anytime a holder of a right-of-way crossing federal land has no right to simply go and build a road across federal land, it's understood that the federal government always has the right to protect the resources, and as the record shows in, say, the communications on the Cheney Creek Road relocation, sometimes those communications are a little difficult, but the parties have always communicated. The counties and the state are not asserting the right to construct a road across every section. It's a right of travel, and it's critical for two reasons. One, in recreating public and the ranchers and the oil and gas industry that often have to travel off-road. It's also important for purposes of communicating and working with the Forest Service, and assuring access not only to state tracks, to the private lands that intersperse the national grassland. This is not undeveloped land. I have to stand up and say, that's just simply not true. The Forest Service definition of roadless excludes anything that can't be used by a county. It's confusing, because the Forest Service definition is quite different, and that's exactly what the King County Court held in rejecting a roadless classification as somehow not indicative. Let me go back- Do you have any response to the point Mr. Halinan made about system roads, that under North Dakota law, there's a limitation on how many miles may constitute a county system or a state system, and therefore, I think his point is the exclusion in the notices couldn't have covered all of the section lines? That statute applies to roads the county intends to maintain. It's not just, again, it's a distinction between a right to travel and roads that are going to be maintained by the county. Again, if you look at the interspersed land ownership pattern, I think the United States, very respectfully, I disagree. I think they've overstated the number of miles affected, because again, you need to have access. Are you talking about a 33-foot section line, or are you only talking about the 60-foot, 66-feet section line right of travel? All right. Your time has expired. Thank you for your argument. Thank you to all three counsel for your presentations. Case is submitted. Court will file a decision in due course.